537 A.2d 69

St. Sava Home, a Pennsylvania Nonprofit Corporation, Appellant *v.* Rt. Rev. Christopher, Bishop of Serbian Orthodox Diocese of Eastern America and Canada, et al., Appellees.

Argued May 19, 1987, before President Judge CRUMLISH, JR., Judge COLINS, and Senior Judge KALISH, sitting as a panel of three.

270

*Bernard R. Roetzel* and *Louis J. Stack,* for appellant.

*Thomas J. Karacic, Katz, Karacic & Helmin,* for appellees.

*Eugene R. Wedoff,* with him, *Albert E. Jenner, Jr., Robert L. Graham, Jenner & Block,* for appellees.

*Irving O. Murphy, MacDonald, Illig, Jones & Britton,* for appellees.

OPINION BY JUDGE COLINS, February 5, 1988:

We here address a dispute between a local church congregation and its parent denomination concerning the right to possession of certain church property in Shadeland, Pennsylvania. The local congregation, incorporated as St. Sava Home (appellant), consists of adherents of Dionisije Milivojevich (Dionisije), former Bishop of the Eastern American-Canadian Diocese of the Serbian Orthodox Church who was removed from that position by direction of the Church Hierarchy in 1963. Appellees are parish members of the parent Diocese and their Bishop, the Rt. Rev. Christopher, duly-appointed successor of Dionisije. By separate orders of the Court of Common Pleas of Crawford County, appellees, respectively, were (1) awarded ownership of the

subject church property consisting of some 19 acres and a partially-completed church building and (2) resolved of any obligation to reimburse appellant the value of such property. Appellant now solely contests the trial court's denial of its claim for entitlement to compensation.

## Factual History

The instant case is a facet of exceedingly protracted litigation initiated by Dionisije in the courts of Illinois and ultimately resolved against his interest by the United States Supreme Court in *Serbian Orthodox Diocese v. Milivojevich*, 426 U.S. 696 (1975). Limited as we are by appellant's argument to the issue of restitution, we leave elaboration of the factual underpinnings and ecclesiastical polity dispositive of Dionisije's action to Supreme Court Justice BRENNAN in *Milivojevich* wherein such matters are comprehensively examined. We will recite only those facts necessary to an understanding of the instant dispute, utilizing an extensive stipulation of facts filed by the parties in the trial court.

In 1922, the Serbian Orthodox Church (Mother Church), whose Patriarchate is in Belgrade, Yugloslavia, formed a religious organization in North America known as the Serbian Eastern Orthodox Diocese for the United States of America and Canada (the Diocese). The Diocese was incorporated in Illinois in 1935 and, since that time, has held title to various real properties, including about 1400 acres at Shadeland in Crawford County. As we have indicated, the Church Hierarchy removed Bishop Dionisije[1] from office in 1963 and he initiated suit in Illinois, challenging not only the

---

[1] In *Milivojevich*, Justice BRENNAN described Bishop Dionisije as a controversial figure and the subject of numerous complaints directed to the Church Hierarchy challenging his fitness to serve as Bishop and administrator of the Diocese.

propriety of his removal from office but also the right to possession and control of Diocesan property and assets.

Despite the pendency of such litigation, persons loyal to Dionisije formed a Pennsylvania non-profit corporation, here appellant, in 1966, in contemplation of the eventual construction of a nursing home and church building on the Shadeland property. On March 27, 1969, the Illinois religious corporation, through Dionisije, conveyed title to appellant of some 19 acres of the Shadeland property for a nominal consideration and without the knowledge, consent or authorization of any representative of the Mother Church. At the time of this transfer by duly-recorded deed, all of appellant's officers, loyal to Dionisije, were aware of the pendency of the Illinois litigation concerning control of Diocesan property.

We see no reason to delve into the Illinois decisions which eventually led to the United States Supreme Court's resolution of the controversy in 1975. Suffice it to say that the Illinois Supreme Court invalidated Dionisije's removal as procedurally and substantively defective under the internal regulations of the Mother Church. 60 Ill. 2d 477, 328 N.E. 2d 268 (1975). The United States Supreme Court granted certiorari and determined that the Illinois Supreme Court had "unconstitutionally undertaken the resolution of quintessentially religious controversies whose resolution the First Amendment commits exclusively to the highest ecclesiastical tribunal of this hierarchical church."[2] 426 U.S. at 720. Finally, the United States

---

[2] Justice BRENNAN found the constitutional provisions of the American-Canadian Diocese "were not so express that the civil courts could enforce them without engaging in a searching and therefore impermissible inquiry into church polity." *Id.* at 723 *(citing Md. & Va. Churches v. Sharpsburg Church,* 396 U.S. 367, 368-70 (1970)).

Supreme Court determined that the decisions of the Mother Church removing Dionisije and reorganizing the Diocese did not alter formal title to all Diocesan property, which title remained in the original property-holding corporations in trust for all members of the reorganized Dioceses.

On September 3, 1979, following the entry of an order of the Illinois trial court implementing the decision of the United States Supreme Court, Bishop Christopher, the duly-appointed successor to Dionisije, entered the church located on the Shadeland property and conducted church services. Claiming the right to control such property, Bishop Christopher directed that new locks be placed upon the building. In response, appellant filed a Complaint in equity in the Court of Common Pleas of Crawford County in which it asserted rightful ownership of the property by virtue of the duly-recorded deed and sought to enjoin the appellees' occupation of the church property. By Answer and New Matter, appellees admitted that appellant had indeed acquired title to the property by deed but averred that the conveyance was unauthorized by the Diocese and thus invalid. Moreover, appellees asserted that the appellant's complaint sought to relitigate matters previously judicially determined and entitled to full faith and credit and that any conveyance by Dionisije to the Pennsylvania corporation was fraudulent.

After bifurcating the proceedings to separately consider the issues of ownership and appellant's alleged entitlement to restitution in an amount equal to the value of the improvements rendered to the property, the trial court determined that ownership of the contested property was vested in appellees. The trial court nullified the original conveyance by Dionisije to appellant because it occurred after his removal from office. Moreover, the court afforded full faith and credit to the Illi-

nois decisions which embodied the determination that the property was held in trust for members of the original Diocese.

The court specifically reserved for future decision the question of appellant's entitlement to compensation and, upon Motions for Summary Judgment filed by both parties, issued a supplemental equity decree on July 9, 1986, denying appellant's claim for compensation. In so doing, the court found dispositive the fact that the conveyance, the subsequent solicitation of funds and the expenditure of volunteer labor for the construction of the church edifice occurred after Dionisije's suspension from his leadership position. The court rejected the proposition that the construction project was one sponsored by individual church members perhaps not cognizant of the underlying legal contest in Illinois, deemed the construction project a corporate undertaking, and concluded that the congregation "knew, or should have known, that when their leader had already been defrocked at the time the project started[,] that they were entering into a speculative adventure of divorcement from Diocese control that might ultimately fail. . . . Equity generally does not aid those who gambled and lost." Appellant's appeal followed.

Before this Court appellant contests solely the denial of its claim for compensation in an amount equal to the value of the improvements made to the property.[3] It submits that appellees will be unjustly enriched by such value if they are not compelled to compensate appellant under equitable considerations. At issue is the value of a partially-completed church building, de-

---

[3] Appellant does not now challenge the trial court's decision which vested ownership of the disputed property in appellees, conferred a constructive trust on such property in appellees' favor and accorded full faith and credit to the Illinois judicial decisions briefly discussed here.

scribed by the trial court as an "imposing sight" in a rural setting but having "little or no opportunity to be used as a worship center."[4] While we sympathize with the congregation's efforts, we are constrained to uphold the trial court's denial of reimbursement.

We have found little guidance from the courts of this Commonwealth in evaluating any right to restitution conferred upon the mistaken improver of real estate. By the rigid rules of the common law, whoever improved the real estate of another did so at his peril; he was not entitled to compensation from the true owner although he may have done so in good faith and with the honest conviction that the land was his. 41 Am. Jur. 2d *Improvements* §4 (1968). In certain circumstances, equitable doctrines have mitigated the harshness of the common law by recognizing the propriety of balancing the improver's right to a remedy against the potential unfairness of requiring the true owner to pay for unwanted improvements. *See* Dickinson, *Mistaken Improvers of Real Estate,* 64 N.C.L. Rev. 37 (1985).[5]

Appellant contends that fairness mandates restitution in the instant matter because it acted in good faith in reliance upon the duly-recorded conveyance of the

---

[4] Appellant disclosed in interrogatories that approximately $210,000 in actual paid bills was spent on construction, plus much volunteer work expended by church members possessing specialized construction skills. The total "costs to date" figure, including donated services, was conservatively estimated at $257,735.00; an additional $50,000 to $75,000 was estimated as necessary to complete the interior of the building. The trial court noted that the remote location negated any possibility that other church groups might view the property as a desirable purchase. Moreover, an independent appraisal estimated the value of the church building to be $61,000.00.

[5] Certain jurisdictions have codified these equitable considerations in so-called "betterment or occupying claimant's acts". *See Id.*

subject property and cites Cobbett v. Gallagher, 339 Pa. 231, 13 A.2d 403 (1940), in support of its contention. Cobbett does indeed acknowledge the equitable principle that "one who occupies land under a bona fide, though mistaken, belief that his title is valid, and who makes valuable improvements thereon, is entitled to be repaid . . . to the extent that the property has been benefited." Id. at 235-36; 13 A.2d at 405. However, appellant fails to note that our Supreme Court in Cobbett denied the improver's claim for reimbursement because he expended such monies with full knowledge that title to the property was disputed (citing Walker v. Quigg, 6 Watts 87 (1837)).

As in Cobbett, we must find that appellant's actual notice of the disputed title to the Shadeland property vitiates a conclusion that it acted in good faith. As the trial court found, the conveyance relied upon by appellant as proof of its ownership of the property was signed by Dionisije some six years after his removal from office by the Church Hierarchy and after his institution of suit in Illinois over the right to control Diocesan property. Most significantly, the parties stipulated that appellant's officers were aware of the pendency of the Illinois litigation at the time of the transfer. Moreover, the Pennsylvania congregation began construction of the church building upon the contested property in 1974, even after the entry of an Illinois decree which held that Dionisije lacked authority to exercise any ecclesiastical or administrative authority with respect to Diocesan property or affairs at any time after the date of his suspension, May 10, 1963. Under such facts, we are constrained to conclude that appellant had actual notice of an adverse claim to the property which must defeat the supposition that it acted in good faith in improving the property. We cannot, therefore, in fairness impose the costs of appellant's improvements upon appellees. "If

such a principle were to be tolerated or sanctioned [under such facts], owners of land might be in danger of being improved out of their title and rights to them. . . ." *Cobbett*, 339 Pa. at 236, 13 A.2d at 406 (quoting *Walker*, 6 Watts at 92).

Accordingly, the Order of the Court of Common Pleas of Crawford County is affirmed.

### ORDER

AND NOW, this 5th day of February, 1988, the Order of the Court of Common Pleas of Crawford County in the above-captioned matter is affirmed.